UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
CARLA PLAZA,

                              Plaintiff,                    **MEMORANDUM and ORDER**

              -against-                                     00-CV-735 (SLT)

UNITED STATES OF AMERICA,

                              Defendant.
-------------------------------------------------------------x
**TOWNES, United States District Judge:**

        Plaintiff, Clara Plaza, brings this action pursuant to the Federal Tort Claims Act, 28

U.S.C. §§ 1346(b), 2401(b), and 2671-2680, seeking to recover damages for injuries she

sustained on December 10, 1998, when she was struck by a car while crossing Worth Street

between Broadway and Church Streets.   The case was tried before the Court without a jury.  For

the reasons stated below, this Court concludes that plaintiff proved that she sustained a "serious

injury," but failed to prove defendant's negligence by a preponderance of the credible evidence.

This Court shall, therefore, enter judgment in favor of defendant and against plaintiff.

**FINDINGS OF FACTS**

        On Thursday, December 10, 1998, plaintiff was employed cleaning offices in downtown

Manhattan (12-13).[1]   In the course of her work, she moved from one building to another in

accordance with a schedule dictating when she was to arrive at each office.  On the date of the

accident, she began work at 6 p.m. at a "car company" about one block from the accident scene,

but was scheduled to start cleaning the Federal Defenders' offices at Broadway and Worth Street

at 6:30 p.m. (14, 35).

----

        [1]Numbers in parentheses denote page numbers in the trial transcript.  Names preceding
the numbers indicate which witness's testimony appears on those pages.

It was already around 6:30 p.m. on December 10, 1998, when plaintiff and a colleague, Carlos Garcia, started east on Worth Street in the direction of the Federal Defenders' offices. Somewhere east of Church Street but west of Broadway, plaintiff decided to cross Worth Street and told her colleague, "Let's cross" (36). The exact location at which she attempted to cross is disputed; plaintiff maintains that it was only 70 feet from Broadway (15) while defendant asserts that it was much closer to the middle of the 500-foot-long block. However, both parties agree that plaintiff attempted to cross Worth Street somewhere mid-block, and not in the vicinity of the crosswalk located at the corner of Worth Street and Broadway.

At the point where plaintiff attempted to cross it, Worth Street is a two-way street with a double yellow line separating the westbound and eastbound lanes. Although both of those lanes are 19 feet wide, as measured from the curb to the midline, Worth Street accommodates only a single lane of traffic in each direction because there are cars parallel-parked along the sides of the road. In order to cross Worth Street, plaintiff first had to walk between two of these parked vehicles before reaching the westbound lane.

Shortly before she crossed the street, plaintiff looked to the east and noticed that westbound traffic on Worth Street was stopped at a red light at Broadway (17). Plaintiff saw defendant's car, which was first in line at the light, stopped at the intersection (18). Plaintiff also looked to the west to check on eastbound traffic before walking between the parked vehicles and into the westbound lane (37, 42-44).

Plaintiff gave conflicting testimony as to which direction she looked just before she entered the westbound lane of traffic, and what she saw when she looked. On direct examination, plaintiff testified that she looked to determine whether any cars were coming before she started to cross the street and saw a car approaching slowly. That car then "came up

2

to [her] very quickly" and struck her (18).  In response to the Court's questioning following cross examination, plaintiff first testified that she looked right immediately before trying to cross the street (42).  Thereafter, she testified that she had looked left just before entering the street, but "saw nothing . . . coming" (43).  When she attempted to cross, however, a car "came on top of [her]" so quickly that plaintiff did not "know where it came from" (43).

Plaintiff also testified that once she stepped into the westbound lane, she could not have avoided the accident because the oncoming car "was moving so quickly that [she] had no time to do anything" (19).  Nonetheless, she claimed to have noticed that defendant's headlights were off and that no one sounded the horn (19).  Plaintiff, who described the impact as "very strong," suffered a broken rib and various injuries to her right knee as a result of the collision (20).  She cried out in pain (20), and almost lost consciousness (37-38).  Her colleague, who did not testify at trial, did not follow plaintiff into the street and thereby avoided injury (19-20, 36).

The accident was also witnessed by a limousine driver, Earl Laidlow, who was driving eastbound on Worth Street at the time.  The Court fully credits the testimony of Mr. Laidlow, except with respect to his recollections concerning the time of day and the use of headlights.  Mr. Laidlow recalled that the accident took place on a "clear evening" between 5 and 7 p.m. (51), yet did not remember whether the accident occurred after dark (51-52).  As a result, he did not know whether the streetlights were on (52), and believed that he would have been able to "see very far" – between one and three hundred feet – without artificial illumination (53).[2]  He also claimed that neither his limousine nor the car involved in the accident had its headlights illuminated (52, 54), even though the headlights in his vehicle turned themselves on

---

[2]This Court will take judicial notice that, according to records kept by the U.S. Naval Observatory, the sun set at 4:28 p.m. on December 10, 1998, in New York City.  *See* http://aa.usno.navy.mil/data/docs/R5_OneYear.html.

"automatically" (52).

Notwithstanding Mr. Laidlow's confusion concerning the lighting, this Court credits his testimony that he was able to see the accident, which took place on a well-lit street less than fifteen feet from him (56). Mr. Laidlow was driving from west to east and was "about the middle of the block" between Church Street and Broadway when he observed a "young lady zipping out from between two [parked] cars" and into the westbound lane of traffic (52). Asked to define the term, "zipping," Mr. Laidlow stated that the woman was "walking briskly" (53), as if she were "trying to get somewhere in a hurry" (69). Mr. Laidlow, who first saw the woman as she passed between the cars (55) and watched her continuously until the accident occurred (65), testified unequivocally that the woman did not look in either direction before stepping into the westbound lane (69-71).

As the woman stepped into the lane, Mr. Laidlow saw a vehicle – which Mr. Laidlow recalled only as a small, light-colored car (59-60) – proceeding eastward at a steady pace (83). Mr. Laidlow could not estimate the exact distance between the car and the woman at the instant she entered the lane, but testified that the car was "right close" to her (78). The car swerved towards the eastbound lane in an effort to avoid her (83). However, according to Mr. Laidlow, the "westbound travel lane" on Worth Street was only about ten feet wide (79), too narrow to permit the driver of the oncoming car to maneuver around the woman (83). Nonetheless, the car did manage to turn to its left somewhat before impact; Mr. Laidlow estimated that if the car had not swerved, "the middle of the car would have hit" her (83).

Instead, the right front fender or bumper struck the woman (61, 83). Mr. Laidlow, who was just about to pass the car when it struck the woman, had an unobstructed view of the accident through his open driver's side window (58, 61-62, 84). According to Mr. Laidlow, it

was not a "big impact," but was sufficient to knock the woman to the ground (62). Mr. Laidlow did not estimate how quickly the car was moving at the time of the accident, but implied that by the time he passed the scene, the car had already stopped and the driver – an African-American man – was about to open the driver's side door (60).

Mr. Laidlow continued driving until he reached the corner of Broadway, where he stopped to inform two transit inspectors or officers of the accident and to ask them to call for an ambulance and for the police (59, 63). Mr. Laidlow claimed that he did not call for assistance himself because he thought that the authorities would respond faster if summoned by the transit personnel (63). However, Mr. Laidlow also did not want to wait for the emergency personnel to arrive. Instead, he handed his business card to the transit personnel, then left the scene (76).

At trial, Mr. Laidlow estimated that the impact occurred only one or two seconds after he first saw the young lady walking between the cars (57). Although he had testified at his deposition that he was unable to recall the length of time, and could not even recall if it was more or less than five seconds (72-75), Mr. Laidlow insisted at trial that his one-or-two-second estimate was accurate and explained that he had arrived at that estimate only after carefully "think[ing] everything over" (75-76). He also testified that there were no trucks or vans parked where the woman attempted to cross the street, but admitted that he "wasn't paying attention to the cars that were parked" (55).

The testimony of Charles Rankin, the man who had been driving the car which struck plaintiff, was largely consistent with that of Mr. Laidlow. Mr. Rankin, an FBI agent who was employed at the Bureau's New York Field Office at 26 Federal Plaza, testified that he had left work shortly after 6 p.m. on December 10, 1998 (236). Although he was an agent who investigated white collar crime (264), Mr. Rankin had a Government-owned vehicle – a 1994

Oldsmobile Cutlass – which was parked on Duane Street, just south of his office (236-38).

After starting the car and turning on the headlights, Mr. Rankin drove it around the block and headed west on Worth Street (238). He stopped at a red light at Broadway (238). When the light changed, he accelerated across Broadway and continued west towards Church Street (238). Mr. Rankin recalled that the "left" (or south) side of the block between Broadway and Church Street was "pretty well lit," but that "there was scaffolding all down that block" and that, as a result, the other side of the street was "pretty dark" (240, 265). However, it was a clear evening and there was no traffic ahead of Mr. Rankin's vehicle or anything else to obscure Mr. Rankin's view of the road ahead (237, 239, 253).

Mr. Rankin credibly testified that he was not going faster than the 25-miles-per-hour speed limit when he encountered plaintiff (238). Like Mr. Laidlow, Mr. Rankin testified that plaintiff had stepped between two parked vehicles and into his lane of travel (240, 250). At the time Mr. Rankin first saw her, plaintiff was already "nearly in the middle of [his] lane" and only about a "vehicle-length" – which Mr. Rankin estimated at 16 feet (247) – ahead of his car (239). Plaintiff was not looking towards the approaching vehicle (264), and appeared to be either running or stumbling, not walking, towards the south side of the street (241, 250, 254).

Mr. Rankin "slammed on [his] brakes and . . . turned the vehicle hard to the left" in an effort to avoid plaintiff (240). Mr. Rankin did not sound his horn because both of his hands were on the steering wheel (241-42). Consistent with Mr. Laidlow's observations, Mr. Rankin testified that the vehicle swerved towards oncoming traffic, but that he was unable to avoid striking plaintiff (239).

At the time the car struck plaintiff, almost the entire vehicle was still in the westbound lane (257). Plaintiff's left side struck the right side of the grille, close to the right headlight (241,

257).  Accordingly, Mr. Rankin estimated that plaintiff was about a car-width, or five feet, north of the double yellow line at the moment of impact (263).  However, the car traveled "a little" after impact (256), and eventually came to rest with about a third of the vehicle in the eastbound lane (255).

Mr. Rankin immediately exited his vehicle to find plaintiff on the ground, with his "headlights . . . shining down on her" (240).  Fearful that plaintiff might be injured further if she were lifted, he told onlookers not to attempt to move her (239).  Mr. Rankin then headed for the curb, passing between two parallel-parked vehicles and climbing over trash bags in order to reach the sidewalk (239).  Mr. Rankin testified that he walked directly from the site of the accident to the sidewalk and, therefore, believed that he was re-tracing plaintiff's steps (239, 252).  Mr. Rankin did not remember the cars he passed between before reaching the sidewalk; he recalled seeing "two red vans" parked along the north side of the street, but could not say with any certainty that plaintiff had walked out from between the vans (250).

Mr. Rankin walked a short distance further west on the sidewalk and entered "Tony's Restaurant," where he called the FBI Operations Center (239, 245).  He reported that he had been involved in an accident and asked the Operations Center to send help (239).  By the time he returned to the street, an ambulance had already arrived (239-40).

The police arrived shortly thereafter, and Mr. Rankin gave a statement to a police officer (240).  He did not tell the officer where the accident occurred, believing that the officer could see for himself (249).  The officer's report stated that the accident occurred 70 feet from the corner of Broadway and Mr. Rankin, perhaps relying on that report, testified at his deposition that Tony's Restaurant was 70 feet west of the intersection (245).  However, at trial, Mr. Rankin testified Tony's was "more like 70 yards" west of Broadway and that, since the accident

7

occurred "just before" Tony's, the accident must have occurred closer to the middle of the block (245, 248).  Mr. Rankin also testified that he considered his reaction time to be "[p]retty average" (243), and that the officer had permitted him to drive home after taking the statement (242).

While Mr. Rankin was speaking to police, plaintiff was transported to Downtown Medical Center, where she was hospitalized for the next three days (Plaza: 21, 38).  During her stay at the hospital, plaintiff received several X-rays (Plaza: 21, 38).  Plaintiff testified that she had a broken rib (20), and believed that an X-ray of her right knee had revealed "a fracture to [her] ligaments and . . . meniscus" (22).  Plaintiff's medical expert – an orthopedic surgeon named Dr. Struhl – confirmed that plaintiff had, indeed, suffered a fracture in the vicinity of her right knee, but that it was a non-displaced tibial plateau fracture (Struhl: 104).   The doctor also testified that plaintiff's medical records indicated that she had sustained fractures to both her fifth and sixth ribs (104).  Dr. Struhl opined that all of these fractures were caused by the accident (104).

At trial, both parties introduced expert testimony from consulting engineers who specialized in accident reconstruction.  These experts agreed on some things: that both the eastbound and westbound lanes of Worth Street were 19 feet wide, as measured from the curb to the midline (Burdett: 139; Meyer: 282), and that the distance from the intersection to the site of the accident was irrelevant in determining whether the collision could have been avoided (Burdett: 225; Meyer: 292).  However, their assumptions and analyses were quite different, as, of course, were their conclusions.

The analysis of plaintiff's expert, Daniel S. Burdett, focused primarily on the distance between Mr. Rankin's car and plaintiff at the time she stepped into the westbound lane of travel.

Mr. Burdett assumed that the parked vehicles between which plaintiff had passed in attempting to cross the street were five feet wide and were parked no more than one foot from the curb (152). He further assumed that Mr. Rankin's car was also five feet wide and struck plaintiff with its right front corner when one-third of the front was already in the westbound lane (154). Based on these assumptions, Mr. Burdett calculated that plaintiff was 9⅔ feet from the driver's side of the parked vehicles at the moment of impact (154).

Assuming that plaintiff was walking at a rate of 4.5 feet per second – which he variously characterized as a "pretty steady walk" or a "steady fast pace" (154-55) – Mr. Burdett estimated that it took plaintiff exactly 2.148 seconds to travel the 9⅔ feet (155). He then calculated that a vehicle traveling 15 miles per hour would travel 22 feet per second (156). However, despite repeatedly testifying on direct examination that Mr. Rankin's vehicle had slowed to a "low velocity" before striking plaintiff (154, 165), Mr. Burdett inexplicably used the 22-feet-per-second figure in calculating the vehicle's distance at the time plaintiff started into Mr. Rankin's lane. Mr. Burdett stated:

> [A]t . . . fifteen miles an hour, which is the same as twenty-two feet a second, . . . Mr. Rankin was forty feet away. Mr. Rankin was forty feet away from the time that Ms. Plaza started to cross to the point of impact. His vehicle is forty feet away (166-67).

Further assuming that Mr. Rankin had a "normal reaction time" of three-quarters of a second (146), Mr. Burdett calculated that Mr. Rankin could stop a car traveling 15 miles per hour in 28 feet (150). He therefore concluded that Mr. Rankin, being over forty feet away when plaintiff emerged from between the cars, would have "had the time and the distance to stop his car and avoid this accident" (178).

Mr. Burdett testified that his conclusion was not altered by changing the assumptions

concerning the speed of Mr. Rankin's vehicle. Mr. Burdett acknowledged that stopping distance increased as the car's speed increased, and that it would take 41 feet for a person with average reaction time to stop a vehicle traveling 20 miles per hour (150). However, under Mr. Burdett's analysis, the initial distance between Mr. Rankin's vehicle and plaintiff also increased with the speed:

> At twenty miles an hour, the stopping distance is . . . forty-one feet. Twenty miles an hour is the same as thirty feet a second, so . . . he's sixty-four feet away (167).

Both the assumptions and the analysis of defendant's expert, Dr. John Edison Meyer, differed substantially from those of plaintiff's expert. Dr. Meyer assumed that plaintiff walked four miles per hour or almost six feet per second, not 4.5 feet per second (284). Dr. Meyer also assumed that Mr. Rankin's reaction time was 1.5 seconds, rather than the three-quarters of a second estimated by Mr. Burdett (286). However, unlike Mr. Burdett, Dr. Meyer was able to cite to the specific studies on which these assumptions were based. He stated that his estimate of plaintiff's speed was based on a 2002 article in the Journal of Physiology (284), and that his estimate of the reaction time was drawn from a peer-reviewed article which summarized the finding of some 50 other studies (286-87).

In addition, Dr. Meyer's calculations concerning distances were more exact than Mr. Burdett's, and were tailored more closely to the facts. Rather than estimate that Mr. Rankin's car was five-feet wide, Dr. Meyer testified that a 1994 Oldsmobile Cutlass was exactly 69½ inches wide (301). Dr. Meyer also recognized that Mr. Rankin's car was still moving at the time it struck plaintiff and that plaintiff, therefore, might have been as far as five feet from the double yellow line at the time of the accident (293).

Based on his assumptions and calculations, Dr. Meyer opined that Mr. Rankin could not

have avoided the accident. By his calculations, plaintiff was in the westbound lane for only between 1.2 and 2 seconds before she was struck by the car (297). If Mr. Rankin's reaction time was 1.5 seconds, he would have had, at most, a half-second to do anything to avoid the collision (298). However, Dr. Meyer testified that the vehicle could decelerate at only three-quarters the speed of gravity and, therefore, could lose only 16 miles per hour of speed per second (296). Since it would have taken longer than the available half-second to stop the vehicle, Mr. Rankin could not have done anything to avoid the accident, even if he had been driving as slow as 15 miles per hour (299).

## CONCLUSIONS OF LAW

This action is brought pursuant to the Federal Tort Claims Act, which waives the United States' sovereign immunity "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the [allegedly tortious] act or omission occurred." 28 U.S.C. § 1346(b)(1) (bracketed material added). Under New York State's "No-Fault Law" – technically, the Comprehensive Motor Vehicle Insurance Reparations Act, N.Y. Ins. Law §§ 5101-5108 – a person cannot initiate a negligence action to recover for damages caused by an automobile accident unless the person has sustained a "serious injury." *See* N.Y. Ins. Law § 5104(a). Therefore, before considering whether defendant was negligent, a court must first determine whether plaintiff has surmounted this "serious injury" threshold.

In this case, there is no question that plaintiff has proved by a preponderance of the credible evidence that she sustained a "serious injury." The No-Fault law defines "serious injury" to include "a personal injury which results in . . . a fracture." N.Y. Ins. Law § 5102(d).

Plaintiff's medical expert, Dr. Struhl, testified that plaintiff suffered three separate fractures as a result of the accident: a tibial plateau fracture in the vicinity of her right knee and the fractures of her fifth and sixth ribs (104). Defendant has made no effort to controvert this evidence, and does not argue that plaintiff did not sustain a "serious injury."

However, this Court concludes that plaintiff has not proved defendant's negligence by a preponderance of the credible evidence. In his opening statement, plaintiff's attorney specifically argued that Mr. Rankin was negligent in that he was speeding and driving without his headlights on. Plaintiff's counsel also implied that Mr. Rankin was not using reasonable care in driving and, for that reason, failed to see plaintiff in time. None of these theories of negligence was adequately proved.

First, there was no evidence whatsoever that Mr. Rankin was speeding. Mr. Rankin credibly testified he was driving no faster than the speed limit at the time of the accident (Rankin: 238). Plaintiff, who did not observe the car moving quickly until just before it hit her (Plaza: 19, 43), was in no position to assess its speed. Moreover, even if this Court were to credit plaintiff's testimony that she "saw [the] car approaching slowly" before "it came up . . . very quickly" (18), this testimony suggests only that the car traveled faster than she anticipated, not that it was speeding. Indeed, the fact that both plaintiff's engineering expert and defendant's engineering expert assumed that the car was traveling at only 15 to 20 miles per hour indicates that there was no evidence in this case that the car was traveling any faster than Mr. Rankin claimed.

Second, plaintiff did not prove by a preponderance of the credible evidence that Mr. Rankin's headlights were off at the time of the accident. While it is true that the only

independent eyewitness to the accident – Mr. Laidlow – testified that they were off, this Court does not credit Mr. Laidlow's testimony in this respect. Although he had a vivid recollection of the accident itself, Mr. Laidlow mistakenly believed that it was daylight at the time. He did not know whether the streetlights were on, and incorrectly believed that he would have been able to see between one and three hundred feet without artificial illumination (53). Accordingly, he believed that *both* he and Mr. Rankin had their headlights off, even though his limousine had headlights that turned themselves on "automatically" (52). This Court thus concludes that Mr. Laidlow's testimony was not based on his recollection that Mr. Rankin's headlights were off, but was based solely on his mistaken belief that it was still light at the time.

This Court also does not credit plaintiff's testimony concerning the headlights. When plaintiff first saw Mr. Rankin's car stopped at a red light on Broadway, she had no reason whatsoever to remember it or to pay any attention to whether the headlights were on or not. When she saw the car again, it was bearing down on her and her attention would doubtless have been on avoiding it, not on its headlights. After the accident, she was in considerable pain and almost lost consciousness (20, 37-38). Under these circumstances, and in light of the fact that plaintiff is most interested in the outcome of this case, this Court concludes that Mr. Rankin's testimony that he turned on his headlights prior to driving from his parking spot is at least as credible as plaintiff's claim that the headlights were off.[3]

---

[3]This Court notes that, even if Mr. Rankin's headlights were not lit, any negligence in this respect would not be a proximate cause of plaintiff's injuries. Plaintiff testified that she had no trouble seeing defendant's car from half-a-block away, and it is undisputed that the area in which the accident occurred was well lit. Visibility was not a factor and, therefore, the condition of Mr. Rankin's headlights could not have been a substantial factor in causing the accident.

Finally, there is no credible evidence that Mr. Rankin was not using reasonable care in driving and, as a result, failed to see plaintiff in time. Although plaintiff's expert, Mr. Burdett, testified that the accident could have been avoided, this Court is completely unpersuaded by Mr. Burdett's analysis. First, many of Mr. Burdett's assumptions were unsupported by, or even contrary to, the credible evidence adduced at trial. For example, Mr. Burdett estimated the point of impact at 3⅓ feet north of the double yellow line by assuming that Mr. Rankin's car was five feet wide and that one-third of the front of the car was over the line at the moment it struck plaintiff. However, Dr. Meyer testified that the 1994 Oldsmobile Cutlass was actually 69½ inches wide (301), and Mr. Rankin testified that his car was almost completely in the westbound lane at the moment of impact (257). Therefore, plaintiff was actually closer to five feet from the line at the moment of impact.

Similarly, Mr. Burdett assumed that the parked vehicles were no wider than five feet and were parked within a foot of the curb in estimating that the driver's side of these vehicles was six feet from the curb. Even assuming that the parked vehicles between which plaintiff walked were cars, there was no testimony concerning the types of cars or the distance between these cars and the curb. Based on Dr. Meyer's testimony that Mr. Rankin's Oldsmobile – a mid-sized car – was wider than five feet (301) and Mr. Rankin's testimony that there was scaffolding on the north side of the block (265), both of Mr. Burdett's assumptions seem questionable.

More dubious yet, however, was Mr. Burdett's testimony that a young, five-foot, four-inch woman would travel only 4.5 feet per second when walking briskly. At 4.5 feet per second, the woman would be walking just over three miles per hour.[4] This seems slow, especially in light of Dr. Meyer's far more credible testimony, based on an article in the Journal of

_____

[4]Someone walking 4.5 feet per second travels 16,200 feet (or 3.0681 miles) per hour.

Physiology, that a woman walking briskly can cover four miles in an hour, or nearly six feet per second (284).

Even if this Court could accept Mr. Burdett's assumptions concerning car widths, distances and speeds – which it cannot – it would conclude that his analysis was deeply flawed. Although Mr. Burdett himself acknowledged that Mr. Rankin's car slowed to a "low velocity" prior to impact (154, 165), he nonetheless assumed that Mr. Rankin's car never braked in making his estimates of how far Mr. Rankin's car was from plaintiff at the moment she entered the westbound lane. For example, he estimated that Mr. Rankin's car was 64 feet away if it was traveling at 20 miles per hour (167), because that is roughly the distance a car traveling at that speed would go in 2.148 seconds. Since the distance Mr. Rankin's car traveled at a constant speed was always further than the distance it took to stop the vehicle, Mr. Rankin was always negligent under Mr. Burdett's analysis, regardless of his speed. This Court rejects this bizarre analysis.

This Court finds the analysis of defendant's expert, Dr. Meyer, to be far more persuasive than Mr. Burdett's. Dr. Meyer's calculation that plaintiff entered the westbound lane only 1.2 to 2 seconds prior to the accident was entirely consistent with Mr. Laidlow's observations. Moreover, Dr. Meyer's conclusion that Mr. Rankin did not have time to avoid the collision is consistent with the testimony of all three eyewitnesses. Both Mr. Rankin and Mr. Laidlow testified that plaintiff caused the accident by suddenly walking into the lane at a time when Mr. Rankin was too close to avoid her. Indeed, even plaintiff herself testified that she looked to her

left before walking into the street, yet somehow did not see Mr. Rankin's car until it was too late to "do anything" (19). The fact that plaintiff could not see Mr. Rankin's 69½-inch-wide car for whatever reason implies that Mr. Rankin was also unable to see the 64-inch-tall plaintiff. Accordingly, this Court cannot find by a preponderance of the credible evidence that Mr. Rankin was negligent.[5]

## CONCLUSION

For the reasons stated above, this Court concludes that plaintiff has not sustained her burden of proving defendant's negligence by a preponderance of the credible evidence. Accordingly, this Court will enter judgment in favor of defendant and against plaintiff.

**SO ORDERED.**

_____/s/_____
SANDRA L. TOWNES
United States District Judge

Dated: Brooklyn, New York
March 29, 2007

---

[5]To the extent that plaintiff argued that Mr. Rankin was negligent in failing to sound his horn, this Court is persuaded that Mr. Rankin, who was gripping the steering wheel with both hands in a fruitless effort to maneuver around plaintiff, acted reasonably in not doing so. Moreover, because the accident was unavoidable by the time Mr. Rankin saw plaintiff, his failure to honk the horn was not a proximate cause of the accident.